IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2025

IN RE RINYAH J.

Appeal from the Juvenile Court for Shelby County
No. FF-7057          W. Ray Glasgow, Special Judge

_____

No. W2024-01339-COA-R3-PT
_____

In the Juvenile Court for Shelby County ("the Juvenile Court"), the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Rickey J. ("Father") and Anionetta J. ("Mother") to their child, Rinyah J. ("the Child"), who was born drug-exposed. After trial, the Juvenile Court found that Father had failed to manifest an ability and willingness to assume custody of the Child and that Mother had committed severe child abuse. It further found that termination of their parental rights was in the Child's best interest. Mother and Father appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Anna L. Phillips, Germantown, Tennessee, for the appellant, Anionetta J.

Laurie W. Hall, Memphis, Tennessee, for the appellant, Rickey J.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Ada Johnson, Memphis, Tennessee, guardian *ad litem*.

## OPINION

## Background

The Child was born on November 11, 2019. Shortly thereafter, DCS filed a petition to adjudicate the Child dependent and neglected and to transfer legal custody of the Child to a non-relative, Tawanda S. ("Foster Mother"). DCS stated that on November 12, 2019, it had received a referral alleging that the Child was born exposed to drugs, testing positive for cocaine at birth. Mother tested positive for cocaine, marijuana, benzodiazepines, and opioids upon admission to the hospital, had a history of heroin and cocaine abuse, and recently overdosed on fentanyl. The Child began to show signs of withdrawal on November 14, 2019. Mother told the Child Protective Services Investigator that she wanted the Child to go to Foster Mother and that she would not attend the Child and Family Team Meeting ("CFTM") or court because she had been through the process before and knew she would be charged with assault due to the drugs in the Child's system. Mother was homeless at the time. Mother was arrested on November 22, 2019. At the initial CFTM, Father indicated that he was currently working on drug abuse recovery; had a history of cocaine, heroin, and pill usage; and wanted the Child to be placed in Foster Mother's temporary custody.

The Juvenile Court entered an *ex parte* protective custody order placing the Child in Foster Mother's temporary legal custody. However, in September 2020, the Juvenile Court entered an order finding that Foster Mother had received "threats from the family" and that it was contrary to the Child's welfare for her to remain in Foster Mother's home. The Child entered DCS custody.

In March 2022, the Juvenile Court entered an order adjudicating the Child dependent and neglected as to Mother and Father and finding the Child severely abused due to "prenatal drug exposure perpetrated by the mother," pursuant to Tenn. Code Ann. § 37-1-102(b)(27). The Juvenile Court specifically found that DCS had entered medical records showing that Mother tested positive for cocaine and the Child tested positive for cocaine and opiates at birth. The Juvenile Court ordered that Mother and Father have no contact with the Child. In March 2022, the Child was placed back in Foster Mother's care.

On February 6, 2023, DCS filed a petition to terminate Mother's and Father's parental rights to the Child. Although DCS raised more than one ground against each parent, it elected to proceed at trial only on the ground of severe child abuse against Mother and the ground of failure to manifest an ability and willingness to assume custody of the Child against Father. DCS further alleged that termination of their parental rights was in the Child's best interest. Trial was held on May 10, 2024.

Father, thirty-six years old at the time of trial, testified that he began using drugs as a teenager. He detailed his history of drug use, stating that he had completed an inpatient drug rehabilitation program three different times and had experienced some periods of sobriety. His periods of sobriety would last anywhere between three months and two years. Father testified that he relapsed into drug use once approximately eight months earlier in September 2023 but that he would be able to pass a hair follicle drug screen if tested that day. He explained that he took a hair follicle drug screen earlier in the week but that he had not yet received the results.

He further testified that he had been in a mental health court program since the beginning of 2023 and that he currently lived in a "sober living structural environment," called "Judicare." He explained that this was a court-ordered program, that he had lived there for nearly a year, and that he would be graduating in July 2024. He further testified that he had participated in therapy and completed a parenting class in February 2024 and a domestic violence class in April 2024. He also completed a "Cocaine & Alcohol Awareness Program" in November 2023. When asked about the curriculum of the parenting class, he stated: "I can't remember anything. I just know I did the class . . . ." Father testified that he has memory issues as a result of being beaten in the head multiple times in 2012.

Father stated that he had not worked since starting the Judicare program but that he had completed odd jobs here and there with his uncle. He estimated that he would need a year after graduating the program to achieve stable housing and employment. He suggested that the Child could live with his mother and grandmother if he were granted custody that day. Father acknowledged that he has a record of domestic violence and theft. He has theft charges pending, but he stated that he expects those to be expunged once he completes the Judicare program.

Father could not remember the last time he saw the Child and did not know how much child support he had paid or that he even owed child support. He testified that he provided items like diapers and food "in the beginning right until [Foster Mother] started having an attitude." He recalled that he had given Foster Mother "some toys and some new clothes or something" when the Child was a month or a year or two years old. He could not remember the specifics. He acknowledged that he never tried to have the no-contact order lifted.

Patricia Jiles ("Jiles"), a DCS family service worker, testified next. Jiles explained that she began managing the Child's case in December 2023. She affirmed that the Child was born testing positive for cocaine and opiates. With respect to Father, Jiles testified that he had engaged in an alcohol and drug awareness program in September 2023 and that DCS had received three clean drug screens from him. According to Jiles, Father had been arrested five times since the Child entered foster care, and he never provided any child support. Father never indicated to Jiles that he wanted to see the Child. She further

explained that Father had not completed any permanency plan tasks prior to her stint as case manager, approximately six months prior to trial. Nevertheless, Jiles acknowledged that Father had been cooperative and maintained contact with DCS.

Jiles testified that Mother had not provided any child support, had not provided any proof of completion of parenting plan tasks, had not completed the requested alcohol and drug assessment or mental health assessment, and had never provided DCS with clean drug screens. Mother also never asked how to have the no-contact order lifted. She described Mother and Father as strangers to the Child.

Jiles testified that she had observed a bond between Foster Mother and the Child. She further testified that the Child was "thriving, well-adjusted," and feels part of Foster Mother's family. According to Jiles, the Child calls Foster Mother "Mom" and does not ask about Mother. Jiles expressed that a change of caretakers would have a negative effect on the Child's emotional well-being.

Mother, thirty-three years old at the time of trial, testified that she started using drugs when she was twenty-five. She testified that she last used drugs sometime last year. Mother explained that she did not partake in any type of drug treatment program since the Child's birth but that she goes to a methadone clinic. She has never completed a drug and alcohol rehab program. She claimed that she would pass a drug screen if tested that day.

Mother testified that she had not worked in four or five years due to her physical impairments caused by a car accident. She explained that she was trying to obtain disability benefits. She lived with her mother and depended on friends and family to support her. She was in jail two or three days prior to trial for reckless driving and contempt of court for failure to pay child support. Mother testified that she had five minor children, none of whom live with her full time. She admitted that she had not completed any parenting plan tasks.

Mother claimed that Foster Mother's husband uses cocaine and that Foster Mother had offered her drugs and money for the Child after she gave birth. Foster Mother denied that her husband uses drugs and explained that she had been separated from her husband for two years. She also denied offering Mother anything in return for the Child. Mother also expressed concern about Foster Mother because Foster Mother's son had been murdered. She complained that Foster Mother's "mouth is reckless" and that she has a photo of her deceased son on her car, which she believed might incite her son's murderers to retaliate against Foster Mother and the Child. The Juvenile Court found Mother's claim that Foster Mother bribed her with drugs and money "not credible on any level."

- 4 -

Foster Mother testified that the Child calls her "mommy" and that the Child is unaware of who her parents are. Although somewhat unclear, Foster Mother testified that Father and Mother last saw the Child sometime in 2021 when the Child was visiting Father's mother. She further stated that she had never received any financial support or gifts for the Child from Father or Mother. According to her, Father reaches out sometimes, but Mother does not.

The Juvenile Court found, by clear and convincing evidence, that Father failed to manifest an ability and willingness to assume custody of the Child and that Mother committed severe child abuse. It further found, by clear and convincing evidence, that termination of both of their parental rights was in the Child's best interest. Father filed a motion to alter or amend the judgment, noting that his drug test results had come back negative. The Juvenile Court denied the motion. Father and Mother appealed.

## **Discussion**

Although not stated exactly as such, Mother raises the following issues on appeal: whether the Juvenile Court erred in finding that Mother committed severe child abuse against the Child, pursuant to Tenn. Code Ann. § 36-1-113(g)(4), and whether the Juvenile Court erred in finding that termination of Mother's parental rights was in the Child's best interest. Father raises only the issue of whether the Juvenile Court erred in finding that he failed to manifest an ability and willingness to assume custody of the Child, pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae*

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[3] Tenn. Code Ann. § 36-1-113(i).

clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Father does not challenge the Juvenile Court's best interest finding, we must review this finding anyway. *In re Carrington H.*, 483 S.W.3d at 511 ("[A]ppellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal.").

When DCS filed its termination petition, the relevant grounds for termination of parental rights were set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;

* * *

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113 (West July 1, 2022 to May 4, 2023).

With respect to the finding of Mother's severe child abuse, the Juvenile Court found:

A severe abuse finding was entered in the dependency and neglect action heard on April 27, 2021, and [Mother] was found to be a perpetrator of that severe abuse. [Father] filed for a rehearing which was dismissed for failure to appear in March of 2023. The severe abuse finding is now part of a final order as to the issue of severe child abuse. Therefore, pursuant to T.C.A. § 36-1-113(g)(4) and as defined in T.C.A. § 37-1-102(b)(27), Respondent [Mother] has committed severe child abuse against Rinyah, a child, in that she knowingly exposed Rinyah to opiates and cocaine in utero which put the child at risk for severe bodily injury or death.

(Paragraph numbering omitted.) A prior finding of severe child abuse by a juvenile court in dependency and neglect proceedings can be *res judicata* in later parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents a parent from re-litigating

- 9 -

whether he or she committed severe child abuse. *Id*. Here, the Juvenile Court found during the dependency and neglect proceedings that Mother perpetrated severe child abuse upon the Child by exposing her to cocaine and opiates in utero. Although Father filed a motion to rehear, this was ultimately dismissed for his failure to appear at court. There is no reason to doubt the finality of the order.

Mother argues that the severe child abuse finding in the dependency and neglect order cannot sustain this ground for termination because the Juvenile Court's adjudicatory order was deficient. We first note that findings of severe child abuse in dependency and neglect orders are not subject to collateral attack in termination appeals. *See In re Charlee N.*, No. M2022-01686-COA-R3-PT, 2023 WL 4883615, at *5 n.5 (Tenn. Ct. App. Aug. 1, 2023) ("[W]e also note existing case law that clearly holds that a finding of severe child abuse in a dependency and neglect order is *not* subject to a collateral attack in a termination of parental rights appeal."). The issue of Mother's perpetration of severe child abuse upon the Child is *res judicata*.

In any event, Mother's arguments fall flat. Mother argues that the Juvenile Court erred by relying on its adjudicatory order given that the order states that the Child was severely abused due to "prenatal drug exposure perpetrated by the mother Antionette [T.]," rather than Anionetta J. However, this was clearly a scrivener's error. The Juvenile Court's adjudicatory order reflects that "Antoinette [J.], mother" was present at the hearing, and the Juvenile Court's incorrect reference to "Antoinette [T.]" later in the order clearly was in reference to Mother. Furthermore, Mother was listed with a hyphenated last name, "[T.]-[J.]," in several Juvenile Court filings, including the petition to adjudicate the Child dependent and neglected, the permanency plans, an order setting trial, and the protective custody order. In a previous order terminating Mother's parental rights to different children, entered as an exhibit at trial, Mother was listed as "Anionette [D.] [T.] aka [J.]." Based upon the record, it appears that Mother sometimes went by the last name "[T.]." We, accordingly, find that the Juvenile Court was clearly referring to Mother in its finding that the Child was severely abused by "the mother, Antoinette [T.]" (Emphasis added.)

Mother also complains that the adjudicatory order failed to specify the type of severe child abuse among the different definitions listed under Tenn. Code Ann. § 37-1-102(b)(27). This argument likewise fails. The Juvenile Court in its adjudicatory order found that Mother tested positive for cocaine and that the Child tested positive for cocaine and opiates at birth. It went on to find that the Child was severely abused due to "prenatal drug exposure" perpetrated by Mother. Although it did not specify the exact subsection of Tenn. Code Ann. § 37-1-102(b)(27), it is clear based on the Juvenile Court's findings that it determined that Mother had committed severe child abuse, pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(A)(i) (West July 1, 2022 to May 4, 2023), which defines severe child abuse as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious

- 10 -

bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." *See In re Kailey A.,* No. E2021-00801-COA-R3-PT, 2022 WL 773617, at *9 (Tenn. Ct. App. Mar. 14, 2022) (noting that, although the juvenile court did not specify which definition of severe child abuse it applied, the evidence presented against the mother demonstrated which subsection was applicable).

Based upon our review, the evidence does not preponderate against the Juvenile Court's findings, and clear and convincing evidence supported its finding of this ground for termination as to Mother.

With respect to the ground found against Father, failure to manifest an ability and willingness to assume custody, the Juvenile Court made the following findings:

> [Father] currently resides in a sober living environment, Judicare, from which he hopes to graduate in July 2024. He entered Judicare in May or June of 2023, and but for one slip in the fall of 2023, for which he takes some responsibility, has remained drug free and otherwise compliant with the program. [Father] testified he has engaged in counseling, including moral recognition therapy, and parenting classes during his time at Judicare. His attorney presented a certificate of completion of a domestic violence class from Innovative Counseling date[d] April 23, 2024, and a completion of a parenting class from February 1, 2024. No other certificates or other documents were submitted by [Father] to show his compliance with any permanency plan tasks requested by the Department of Children's Services. [Father] acknowledges he has abused alcohol and drugs from an early age up to and including the time Rinyah was born and even after he entered Judicare in late May or early June of 2023. (See Exhibit 1, Domestic Violence Certificate, and Exhibit 2, Parenting Certificate.)

> [Father] is father to two of [Mother's] seven children. His other child is in the physical and legal custody of his mother, Pamela [J.]. [Father] was in a different residential drug treatment program at the time of Rinyah's birth. He was allowed to visit soon thereafter, and he added his name as the child's father on the birth certificate.

> The Court found [Father] to be less than candid or forthcoming in his testimony. He embellished his current circumstances as caused by past and untreated trauma which led to his long-term drug use and criminal behaviors. He was either unable or unwilling to answer direct questions as to how often he engaged in multiple acts of theft and why he had made no effort to engage in lawful and gainful employment. He offered no explanation as to why he made no effort to visit or support his child prior to

the no contact order other than Ms. S[.], foster mother "got an attitude." He also offered no reason why he made no effort to show he desired custody of his daughter until he was placed in Judicare as a result of his criminal behavior and drug addiction. To his credit, [Father] has engaged in rehabilitation programs before and stated he was going to continue his efforts until "I get it right." He stated he has a mental health diagnosis of Post Traumatic Stress Disorder and takes medication for depression. No documentation or records of his diagnosis or treatment plan was presented. [Father] looks forward to graduation and entering a trade school but has no specific employment prospects at this time. He plans to reside with his mother and grandmother upon release and work toward being self-supporting and obtaining housing.

The Court finds [Father] was not only timely informed of his daughter's birth, but that the testimony of the parties makes clear that [Father] was fully aware that [Mother] relinquished custody of the child to [Foster Mother], current foster parent. He testified under oath he had provided gifts to the child and visited initially but that he quit after [Foster Mother] was "getting an attitude."

The Court notes the child was adjudicated dependent and neglected on April 27, 2021, and a no contact order was entered preventing either parent from having visitation with Rinyah. Despite this no contact order, testimony was presented that both parents saw the child at various times through Pamela J[.] and on at least one occasion when [Foster Mother] happened to be in the neighborhood, and she allowed the parents to take pictures. By the parents' own testimony these visits occurred more by accident than design. Per their own testimony, the parents made no efforts to have visitation restored or to provide any financial support for the child.

[Father] admits he quit seeing the child of his own volition and that he made no effort to set aside or modify the no contact order.

The Court finds that the positive steps [Father] has made- the parenting classes, the mental health assessments, domestic violence classes—are all positive things but they needed to be done much sooner than after the filing of the Petition before the Court.

Despite [Father's] current efforts, for which he deserves to be congratulated and encouraged, the Court finds that pursuant to T.C.A. § 36-1-113(g)(14), Respondent [Father] failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody or financial responsibility of the minor child. The Court further finds that placing

- 12 -

Rinyah in the legal or physical custody of [Father] would pose a risk of substantial harm to the physical or psychological welfare of the child, [Father] is still in a recovery program in a halfway house where the child cannot reside. He has pending criminal charges that he hopes to get dismissed or expunged, but it will still be quite some time before [Father] would be even close to being in a position to have this child. In the meantime, the child has developed a strong parental relationship with [Foster Mother] whom she calls "mommy." She has only seen her parents briefly since early 2021 and rarely before then. Ms. Jiles testified that it would traumatize Rinyah emotionally to be placed with her parents as they are essentially strangers to her.

(Paragraph numbering omitted.) The evidence does not preponderate against these findings.

Our Supreme Court has explained this ground as follows:

Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Father argues that he demonstrated a willingness to assume custody of the Child by satisfying or attempting to satisfy all of the permanency plan requirements and that he demonstrated an ability to assume custody by "demonstrating his commitment to sobriety and therapy." Although Father is correct that he made strides to achieve stability, Father began his efforts in earnest only after DCS filed its petition to terminate his parental rights and after the Child had been removed from his custody for nearly four years. Due to his delay in making these efforts, Father had not yet graduated his sober living program and testified that he would not be able to achieve stable housing and employment for another year.

Furthermore, Father last relapsed into drug use eight months prior to trial. Father testified that he had used drugs since he was a teenager and had completed rehab approximately three other times. Although eight months' sobriety is something for which Father should be congratulated, Father's sobriety has largely been untested in the long term. Moreover, Jiles testified that Father had been arrested five times since the Child entered foster care. Again, we commend Father on his efforts to achieve stability, but after four years in DCS custody, the Child should not be made to wait in the limbo of

- 13 -

foster care to see if Father can ultimately achieve long-term stability and sobriety after years of neither.

We, accordingly, conclude that while Father might have demonstrated a willingness to assume custody, he waited until the eleventh hour to demonstrate such willingness. In any event, Father has failed to manifest an ability to assume custody of the Child by his own admission. Removing the Child from the only home she has ever known and placing her with a stranger, whether that be Father or his mother, would pose a risk of substantial harm to the Child's emotional well-being. Father had several years to achieve stability and the ability to assume custody and did not do so. We, as the Juvenile Court did, find that clear and convincing evidence established this ground against Father.

We next address whether the Juvenile Court erred in finding that termination of Mother's and Father's parental rights was in the Child's best interest. On Febraury 6, 2023, when the termination petition was filed, the statutory best interest factors read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
>
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
>
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
>
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
>
> (F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

- 15 -

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2022 to May 4, 2023).

The Juvenile Court made the following best interest findings with respect to both parents:

a) Pursuant to T.C.A. § 36-1-113(i)(1)(A), a termination of parental rights will allow this child's critical need for stability and continuity of placement throughout the child's minority. [Foster Mother] and her husband have known Rinyah since shortly after she was born though the story of how she knows mother and met Rinyah is a bit convoluted and unclear. After being removed from her home in the fall of 2020, Rinyah was returned to the care of [Foster Mother] as a foster child in March of 2022. Testimony of both Ms. Jiles and [Foster Mother] testified that Rinyah and [Foster Mother] have a close mother-daughter bond, that Rinyah is thriving in [Foster Mother's] care, and that [Foster Mother] hopes to adopt Rinyah.

- 16 -

b) Pursuant to T.C.A. § 36-1-113(i)(1)(B), a change of caretakers and physical environment is likely to have a negative effect on the child's emotional, psychological, and medical condition. Ms. Jiles testified, and the parents' own testimony supports, that Rinyah has almost never seen her parents and that she does not know them. Ms. Jiles stated that to remove Rinyah from her home and to place her with strangers would traumatize her emotionally.

c) Pursuant to T.C.A. § 36-1-113(i)(1)(C), the mother and the father have not demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. Both parents testified they have provided little to no support for the child. The parents also testified that they do not know their daughter and what she needs due to the restraining order that is in place.

d) Pursuant to T.C.A. § 36-1-113(i)(1)(D), the mother, the father, and the child do not have a secure and healthy parental attachment, and there is not a reasonable expectation that the mother can create such attachment. Both parents testified that they have rarely seen or visited with their daughter. Neither parent has sought to have the restraining order lifted that began prohibiting their visitation in 2021. As Rinyah has been in foster care for over three years with minimal efforts by the parents to bond with her, it is not reasonable to expect they can create an attachment soon.

e) Pursuant to T.C.A. § 36-1-113(i)(1)(E), the mother and the father have not maintained regular visitation or other contact with the child and did not use the visitation or other contact to cultivate a positive relationship with the child. Testimony was that a restraining order has been in place between the parents and the child since 2021, that neither parent has tried to lift it, and that neither parent visited much prior to the entry of that order.

f) Pursuant to T.C.A. § 36-1-113(i)(1)(H), the child has created a healthy parental attachment with another person or persons in the absence of the mother and the father. Per the testimony of Ms. Jiles and [Foster Mother], Rinyah has formed a secure parental attachment with [Foster Mother].

g) Pursuant to T.C.A. § 36-1-113(i)(1)(J), the mother and the father have not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in their homes. Per their testimony, both parents are currently actively seeking to address their criminal issues and addiction issues so that they can change their circumstances. However, both parents are still ongoing in their treatment

- 17 -

and the court cannot find they have made a lasting adjustment of circumstances.

h) Pursuant to T.C.A. § 36-1-113(i)(1)(M), the mother and the father have not demonstrated a sense of urgency in seeking custody of the child or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest. Both parents testified that they are currently seeking treatment to address their drug issues, but both parents testified they began this treatment in the last year which was over two years since the child entered foster care.

i) Pursuant to T.C.A. § 36-1-113(i)(1)(O), the mother and the father have not ever provided safe and stable care for the child or any other child. Neither parent has ever provided care for Rinyah. Further, [Father] admits he has lost custody of his only other child with [Mother] to his mother. [Mother] testified that she has never successfully parented any of her children.

j) Pursuant to T.C.A. § 36-1-113(i)(1)(P), the mother and the father have not demonstrated an understanding of the basic and specific needs required for the child to thrive. [Father] testified that he suffered trauma years ago that affects his ongoing ability to do things. [Mother] testified that she was in a car accident years ago that affects her ability to do things. Neither parent knows this child. It takes a lot to meet a child's needs and neither parent has made it to a point where they can take care of more than their own needs.

k) Pursuant to T.C.A. § 36-1-113(i)(1)(Q), the mother and the father have not demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. [Mother] testified that she has lived with her mother for much of her life and that she was not planning to seek another home until the child was returned to her care. [Father] is currently taking care of his issues, but he is residing in a rehab facility and not a home.

l) Pursuant to T.C.A. § 36-1-113(i)(1)(R), the physical environment of father's home is unhealthy and not safe for the child. [Father] resides in sober living facility where he is unable to live with his daughter and while there is nothing per s[e] unsafe about the facility to the Court's knowledge, it is clear it is not a home for his daughter.

m) Pursuant to T.C.A. § 36-1-113(i)(1)(S), the mother and the father have not consistently provided more than token financial support for the child.

Both parents testified to providing minimal, if any, financial support for the child in the form of in-kind gifts.

n) Pursuant to T.C.A. § 36-1-113(i)(1)(T), the mental or emotional fitness of mother and the father would be detrimental to the child or prevent mother from consistently and effectively providing safe and stable care and supervision of the child. Both parents testified they have addiction issues and potentially underlying mental health issues that they are currently trying to address. While the Court applauds the efforts of the parents to get sober and healthy, their testimony shows that neither of them is in a place where they can consistently and effectively parent and supervise a young child.

The evidence does not preponderate against these findings.

Mother argues that the Juvenile Court erred in several respects by finding termination in the Child's best interest. First, Mother argues that the Child was unsafe in Foster Mother's care because of the murder of Foster Mother's son, Foster Mother's "reckless" mouth, and the son's photo on Foster Mother's car. Mother's concerns are speculative. Neither was a clear picture of the death of Foster Mother's son and the circumstances surrounding it presented, nor did Mother adequately explain how a photo of Foster Mother's son on her car would place the Child in danger. We are unconvinced by Mother's argument.

Second, Mother argues that Foster Mother's home is not safe because Foster Mother's husband is a "known drug user." However, Foster Mother contested this allegation and testified that she had been separated from her husband for two years. Although Mother correctly notes that the Juvenile Court did not address Mother's allegation that Foster Mother's husband was a drug user, there was no indication from any of the testimony at trial that Foster Mother's husband has any involvement with the Child at all. Furthermore, we can conclude that the Juvenile Court did not find Mother's allegation credible by the manner in which it resolved this case. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("Indeed, the trial court's findings with respect to credibility and the weight of the evidence, as in the present case, generally may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). We, therefore, find Mother's argument unconvincing.

Mother also contends that the Juvenile Court erred by failing to consider factor (I), whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage. Although Mother correctly notes that the Juvenile Court did not consider this factor, it appears that the Juvenile Court did not consider it a relevant

factor for good reason. There was no evidence to indicate that the Child has an emotionally significant relationship with any person from her biological family, whether that be the parents themselves, grandparents, or siblings. In any event, even if this factor weighed against termination, it would not have outweighed the numerous other factors which weighed in favor of termination. We, accordingly, find no reversible error in the Juvenile Court's failure to explicate its thoughts on this factor in its order.

Based upon our review of the Juvenile Court's findings, all the evidence presented at trial, and the language of the best interest factors, we discern no reversible error in the Juvenile Court's finding that termination of Mother's parental rights was in the Child's best interest. Mother essentially took no steps toward reunification with the Child. She acknowledged that she completed no permanency plan tasks, had not had a job in four or five years, had used drugs as recently as the previous year, and was arrested a few days before trial for reckless driving and contempt of court for failure to pay child support. She has never engaged in drug abuse treatment or provided DCS with drug screen results. She made little to no effort to visit the Child or provide support to the Child. Mother and the Child are strangers. In contrast, the Child is thriving in Foster Mother's care. The Child and Foster Mother have a parent-child relationship, and the Child calls Foster Mother mom or mommy. For all these reasons, clear and convincing evidence supports the Juvenile Court's finding that termination of Mother's parental rights was in the Child's best interest. We affirm the Juvenile Court's termination of Mother's parental rights to the Child.

With respect to Father, we acknowledge, as the Juvenile Court did, that Father has made improvements in his life such as engaging in drug abuse treatment and therapy, but he has no ability to take care of or assume custody of the Child while he is living in the sober living facility, and he will not be able to do so for at least another year by his own admission. Father, like Mother, is essentially a stranger to the Child. This Court has previously noted that "[a]n absence of contact between a parent and child for an extended period of time can lead to, in effect, the 'death' of the relationship." *See In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *4 (Tenn. Ct. App. Oct. 23, 2019) (citing *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 (Tenn. Ct. App. June 16, 2011)). Although Father appeared to be getting his life in order, he waited until after the termination petition was filed to do so. Time has marched on. By the time Father suspected he would be able to assume custody of the Child, the Child would be five or six years old. It is not in the Child's best interest to linger in foster care while Father may or may not continue in his progress. Moreover, Father provided at best token support to the Child over a period of four years. Father was arrested five different times after the Child entered foster care, and the Juvenile Court found him less than forthcoming about his history of shoplifting. Father had no job or housing of his own. For all these reasons, we conclude that clear and convincing evidence supported the Juvenile Court's best interest finding and affirm the Juvenile Court's termination of Father's parental rights to the Child.

## **<u>Conclusion</u>**

For the foregoing reasons, we affirm the Juvenile Court's judgment and remand for collection of costs below. Costs of the appeal are assessed against the appellants, Anionetta J. and Rickey J., and their sureties, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE